May it please the Court, Knowing an individual has died in police custody without knowing more, is insufficient to charge any individual police officer with a cause of action based on a 1983 claim. And that's what's at the core of this case. At the lower court, we were dismissed at the 12B6 stage because we filed our cause of action after the statute of limitations expired. This is the second phase of an ongoing lawsuit. We initially sued the facility itself and the sheriff who maintains the jail in Tarrant County. In the course of that litigation, we were alerted to the realization that individual officers might also be able to be charged based on 1983 claims. We did not learn that until the New York Times published an article on November 30th of 2021. Clearly, sadly, tragically, you knew about the death. Yes, sir. And you knew enough to make a first complaint on the last day possible, right? Against the facility and the sheriff, yes. And what's your best argument that your client didn't lack diligence in trying to discover the individual defendants? Now, does she fully avail herself of discovery mechanisms? Yes, but there's something that needs to be considered, and that is, initially, all she knew is that the man died. That doesn't imply— The man is her husband, right? Yes, sir. That doesn't imply wrongdoing on anyone's part. He could have had a brain aneurysm. He could have had an encounter with another inmate. He could have been responsible for causing an accident. There's no reason to believe that there was wrongdoing on the part of an individual police officer that— But you did file a lawsuit. We did file a lawsuit. You were under wrongdoing. Wrongdoing with regard to the fact that we knew he was introduced to pepper spray, and we knew that he was asthmatic. But the New York Times found it, but you guys didn't have to find it. No, the New York Times found additional facts, Your Honor. The New York Times stated— That cuts against you. Beg your pardon, sir? That cuts further against you. At the time— You already had facts. We knew those facts, yes. But we— I guess what I'm asking is, is the New York Times invested with powers that you all didn't have and shouldn't be imputed to you? I would say no. However, they have more success with obtaining public records than private attorneys do, because they knew that information based on records that were not made available to us at the time, and that we were not able to obtain until after the statute of limitations run. We made a public records request, though, in August of the month that he died. We made our first—because we weren't involved with the case at that time. I mean, but why didn't she? I'm really asking about her diligence. The record is incredibly scant about anything she did until the suit was filed almost two years later. I understand that. All she was doing at that time was asking questions of the people she was in contact with in terms of the death notification and in terms of what she understood to be the causation of death. But she had no reason to believe that there was any wrongdoing such that she would make an open records request. I would ask the court to consider, had she made an open records request, the first time she could have obtained anything that would have been helpful along those lines would be when the autopsy was first published one year later after the death. So with respect to how we're evaluating her diligence, I hope the court will consider that no information would have been available until at least the year after his death. It's within the statute of limitations. It would have been within the statute. It's well within. It would have been well within it, however, even that autopsy doesn't give any basis for charging an individual police officer with the cause of action under 1983. We know that there was a struggle from that autopsy. We know that he was pepper sprayed from that autopsy. A physician could determine that the cause of death listed in the autopsy was implausible given the fact that he did not have sickle cell anemia. But that is not enough to charge any individual officer or healthcare personnel at a jail with wrongdoing on a 1983 claim. Is Texas law, though, sort of pretty inhospitable to tolling based on the lack of identity of a defendant? It is, Your Honor. I think that one thing we have to consider, though, is what is typically known to a plaintiff at the time involving those legal assessments. Even if you look at the cases that we have cited in our briefing and that the cases that the defendant have cited in their briefing, the individual at least knows that they're harmed. Take the seminal case, Kubrick, for example. He knows that he goes to the hospital to have an infection treated and he knows that later on he's deaf. It stands to reason that the deafness was caused by that procedure since they coincide in time. And then after that, the first doctor he confers with a year later says, yes, that antibiotic is known to cause deafness. Then later a second doctor says, and it shouldn't be administered for that reason. Here, she knows nothing except... Kubrick, is Kubrick at the essence of your argument to us in terms of when we assess due diligence for equitable tolling? It's a fact question. And one aspect of the fact question is, did the defendants withhold evidence? That's correct. Kubrick is, because of some of the language that is included in the opinion, and I'm reading from page 122, that he has been injured, in fact, may be unknown or unknowable until the injury manifests itself. And the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff, or at least very difficult to obtain. It matters here that all of the information that relates to our ability to file these 1983 claims is in the hands of the state. The only way we can obtain it is through them. But when you start to consider what a diligent, reasonably situated plaintiff would do, it has to factor in what they know and what they have reason to suspect based on the information that's available to them. You did file your first complaint timely. Yes, sir, we did. And then what happened with discovery in that matter? We never proceeded to discovery in that matter. After filing the complaint, we started... After filing the complaint, we initially asked the agencies to share information with us. When they chose not to share information with us, then we started filing open records requests. We started filing those open records requests roughly six weeks, excuse me, two weeks. We filed our complaint on July 30th, 2021. We filed our first open record request with the Department of Public Safety on August 12th, 2021. And ultimately, the information that we needed in order to file claims against individual officers was included in the materials that we received back from DPS. So what investigation took place within the statute? Within the statute for the first case, the investigation consisted of information that we could obtain before filing the initial lawsuit. But our argument, Your Honor, would be that within this claim that's currently before the court, all the investigation preceded us actually filing the cause of action because we didn't learn about these circumstances until November 30th of 2021. What did she do during those two years to find out? During those two years, the most that I can tell this court is she made repeated calls to people at the jail who she believed had information about her husband's death. That's the extent of what we can say before she... But then she files a timely complaint. She files a timely complaint. You expect the government to respond to public records requests. We do, but we can... Did you, in the end, have to file a mandamus to get them to respond? We did, and they didn't respond after the mandamus. They didn't respond until the suit was discussed. Meanwhile, the district court's denying your request for discovery, correct? That's correct. In the first case and the second case. I cannot say that we made a direct request for discovery, Your Honor. We filed a mandamus. I don't want to misrepresent that in the first case. Well, I'm looking at the district court's ruling in the first case, I think it's the first case, February 11th, 2022, plaintiff's request ignores the fact that Iqbal doesn't unlock the doors of discovery. Accordingly, the court rejects plaintiff's suggestion that she be permitted more discovery. Apologies, Your Honor. And then the second case, the court, she asks him for discovery again, and he says no, qualified immunity, motion to dismiss, grants the stay request by the defendants. You are correct, Your Honor. So at every effort, she's being told no by the district court, you can't get discovery. Which I think characterizes the nature of any investigative action she would have taken prior to filing suit. If we're not able to get the information, I don't know how a reasonable person in her position could be expected to obtain this information, which is solely in possession of the state. Well, we've seen in cases like Villarreal, people like the New York Times have ways to get it. They do. And I can tell you that agencies respond very differently to requests that are offered by the journalist. That's why we found the New York Times article. We were scouring information to see if anybody had reported on these events and had reported information that would be useful to us. That's how we found the New York Times article. We did make contact with the journalist who wrote the article. He was not willing to share the public disclosures that were made to him. But it is notable that the state had already disclosed the information that we were asking for. Because part of what I think their defense is when they anticipate litigation, they shouldn't have to do that. But they were disclosing information to journalists. We cannot credibly bring 1983 cases without having enough evidence to reasonably suggest to a court that we can overcome the burden of qualified immunity. We need more than that there was a scuffle when we're dealing with a man who's homeless who we know is living with mental disabilities. He might very well have had a scuffle with an officer with no wrongdoing being impartable to that officer. We had to know more. And the only time that we actually were able to obtain sufficient information to make that determination was April 13th of 2022 when we had the 250-page report that was issued by the Texas Rangers who investigated the circumstances of Mr. Miller's death. Suddenly it comes to light, who did it? And they give that to you? How long after you originally requested it? That was given to us in April of 2022. We first requested that record from DPS in August of 2021. So that would have been roughly four months and some change later. Just coincidentally, the day after the limitations period's run? Yes, sir. And what's important to note is that none of the other materials that we had, including medical records, mentioned any officer specifically by name, nor did they mention specific acts performed by an individual officer that we could attribute even to, say, John Doe Officer 1. If we could say John Doe Officer 1 committed the following four acts at this time in this context, we would have. But we didn't even have enough information to do that before we had the Rangers' report. Your Honor, that is the essence of our argument, unless you have, I'm sorry. So if you lose, is it a blueprint to thwart 1983? I believe so, because the blueprint would be, just don't provide the information. And that's not a reasonable solution when all of the information is within their possession. It would be different if our plaintiff was situated similarly to any other plaintiff in this case. Let's take one with a delayed lawsuit being filed like Petroski. In Petroski, she knows she's been shot in 1980, but she doesn't know until 1993 that an informant warned the police department before she was shot. So when that information comes to light, then she can file suit. Her problem was that she didn't allege a policy under Monell's that could sustain the lawsuit. But if she knew anything more than that he was dead, she could have done more. But to say that she should immediately jump to making assumptions encourages the worst possible types of assumptions about law enforcement. All she knew is that her husband was dead. There was no reason to suggest that any individual police officer or employee at the jail bear any responsibility. And she sees head laceration, pepper spray. That allows her to say, there's something suspicious here, she files on time. Is that basically what happened? No. I would say that there's more to that. And with the interest of transparency, I would love to address it. So I am not- I ask that because the defendants, these individual defendants didn't obstruct getting the medical reports, correct? That's correct. So I do not remember exactly when we had the first version of the autopsy report. I believe we had it before we filed. I took that autopsy report, I conferred with my wife, who is a physician scientist, and I asked her to look at the medical results in the autopsy report. Several things jumped out, not the least of which is, a man was said to have died of sickle cell anemia when he didn't have sickle cell. You can't die of sickle cell anemia if you don't have sickle cell. We also knew from the timeline in the autopsy report that when he initially presented at the jail, he made no medical complaints and showed no signs of medical problems. Combine that with the fact that he's a 38 year old man with no known health problems, they don't typically drop dead. And he was accused with destruction of property to the tune of $751. The only way to cause that much damage, according to people we talked to who work on cars, is to damage more than one panel on the outside of an automobile or to damage so much of the interior of the automobile that you cause over $750 worth of damage. That can only be done by vigorously kicking. So a guy who's 38 years old with no known health problems, who's vigorously kicking a squad car, somehow dies hours after being arrested, after making no complaints about any medical problems, and he dies within an hour of first being pepper sprayed, and we know that he's asthmatic. The reason I say that we died, as a lawyer looking at it, I didn't realize he died within an hour of being pepper sprayed. But a crash cart was brought, and my wife explained to me, that means if you look at these records, his heart had stopped and he had no pulse. He has no pulse, and he's not breathing. He also complained within ten minutes of being pepper sprayed. So now you have a situation where if the medical assessment is done properly during intake, you should have known the man was asthmatic. If you pepper sprayed him, and he died as a result, even though you resuscitated him, and you took him to the hospital immediately afterwards, it suggested at the very least, the manner in which the pepper spray was deployed represented excessive force. And if there's a policy of pepper spraying people under those circumstances, when you know they're living with mental health disabilities, and you know- Because your time's running out. Knowing that, putting together that Sherlock Holmes at the last minute, and filing timely, could you have put in John Doe, and it would relate back or not? Not with the information that we had, no sir. There was not enough to put in John Doe's against individual police officers with that information. But even if you had, the law doesn't say that saves you from tolling, does it? It does not. We still have to be able to provide their names, which we couldn't at the time. Okay, thank you counsel. Yes sir. Mr. East. Good afternoon, and may it please the court. My name's Kenneth East, and I represent all nine of the defendant appellees for purposes of argument today. As this court should affirm the district court's dismissal, as an initial matter, the loss of Mr. Miller's life is certainly unfortunate. But defendants, I know it's not the issue today, strongly disagree with the allegations and characterizations made by plaintiffs. But the case turns on the statute of limitations. As this and many other courts have recognized, I think statute of limitations is an important part of our civil justice system. It's applied rigidly, and exceptions are applied only in rare and exceptional circumstances. Okay, let's talk about the cases that he brought up that do apply those exceptions. Edith Jones in the Piotrowski 2 case, she quotes approvingly the earlier Piotrowski case with Judge Smith on it. Citing the Kubrick Supreme Court decision to say, when a defendant controls facts surrounding causation, such that a reasonable person couldn't obtain the information, even with a diligent investigation, cause of action accrues, but the statute of limitations is told. Same outcome in Greene. We said strict application of limitations, quote, would be inequitable because the delay in determining the identity of John Doe is not attributable to Greene. So how was the delay in finding out your client's names attributable to her, rather than the fact that DPS refused to turn over documents for almost a year? So I'm asking you to address Piotrowski and Greene, because I read Fifth Circuit law and Supreme Court law to say, equitable tolling when the defendants possess the information to show causation. Who did what? In that circumstance, it's a fact question that goes to the jury. Maybe she delayed, or maybe the government concealed. Neither of those cases forgive a plaintiff's complete lack of diligence, as this court has already held. Well, you haven't argued collateral estoppel, basically. You did not argue in your brief collateral estoppel from that. Is that correct? Did you, or didn't you? Yes, you didn't argue it. You're correct about that. Because, as the court observed, these defendants are not the defendants that plaintiffs at one time accused of withholding documents. Nonetheless, the factual determination by this court was Ms. Jenkins, for the two years, did not exercise diligence. Piotrowski's, the case in reverse, where she didn't know the government's underlying involvement, couldn't have known. It's complex. Greene is a case that I would love to talk about, because it shows what the court just asked opposing counsel. Greene, the plaintiffs filed their lawsuit timely against John Doe's, no John Doe's in our case, and asked for discovery, which was denied. They appealed, they won, and the later court said, it was told during that time because you were diligent and you sued John Doe's. None of that happened. She did file timely. It was at the last minute. But then what happened was, because she didn't have the information, she loses under ICPSR. In the lawsuit she filed here in this case, she alleged that Mr. Miller died a wrongful death at the hands of county employees who used excessive force. She had all the information she needed for the claim to accrue, but she chose to sue only the county. I'm not disputing accrual. I'm not disputing accrual. We're talking about equitable tolling. How did she know? Even if she'd put in John Doe, you agree with him. I assume the law doesn't, that doesn't toll limitations. It didn't in Green and- But it doesn't as a matter of law. If she had sued John Doe's and immediately moved for discovery and that was denied, they may have an argument for tolling under those circumstances. But none of that happened. Was I wrong when I read out the district court's orders in both cases, each time denying discovery? There was- I'm not wrong. When I read, I'll read it out again if you want me to. In our case, she filed at the last minute, asked for no discovery, sent an open records request to the DPS two weeks later. It wasn't until three months later she ever sent her first open records request to Tarrant County, which was after the statute of limitations, even as to the county, would have run. Any discovery dispute or allegations came after all that. And she filed a motion to, a rule 60 motion to overturn the final judgment, where she tried to amend her complaint, but by then it was too late. There had already been a final judgment entered. I don't think- That's before the first appeal. But in the second case, I'm looking at the docket entry number 17, order of the court, before the court is defendants, individual defendants, motion to stay discovery. Court finds the motion should be and hereby is granted. All discovery is stayed pending the qualified immunity motion. In our case, this case? Yeah. Yeah, but that, the limitations have long since run by then. But the case before, you heard me read out the order there too, discovery denied. But, but in that case, it all came after the fact, after the final, I mean, the court, the court, plaintiffs didn't sue John Doe in that case, for one thing, and they didn't ask for discovery when they came into the case. John Doe doesn't help. What's the law that says you can sue John Doe and then roll past the limitations period? Green versus Doe is the one that says John Doe practice is still alive and well in this circuit. And that's what you should do if you have a claim. And they know they have a claim because they said, we're suing these individuals in the first lawsuit. They didn't name them, but they said, we're suing the individual agents of the county for the wrongful death of Mr. Miller. Do you want to? Why did, why did DPS not give over the public records documents until the day after limitations ran? I have no understanding or control over the DPS, your honor. We're, we represent the individual. Yeah, but her complaint alleges conspiracy, Tarrant County, with the individual defendants, to conceal the information. She alleges that. I, I, I don't, I saw her read that as being part of this appeal. I don't think it was in her, her brief in this case that we conspired. Certainly none of- Well, it's in the complaint. None of our defendants conspired. Let me read 174 of the complaint. Tarrant County intentionally concealed this information and relevant documentations for the benefit of the individual defendants. That's what she pled. Right, but she sued the county. That was her choice. That case got dismissed, final judgment appeal affirmed. Now she comes back with a whole second bite of the apple. There's no case that she cites. Right, but at this point, you still, you're, you're stonewalling. Even with the mandamus request, you're not telling her who did what. So, she comes back with a second effort. As soon as you've turned it over, conveniently a day after limitations has passed, your whole argument is time barred. We didn't give it to her until the day after. That's when she found out she's out of luck. And how, how is that not a correct characterization of your legal position? Well, I mean, you're, you're talking about things, she's alleging the Texas Rangers Department of Public Safety. Okay, so is your argument here in imputation one, they may have concealed it. And she alleged there was concealment, but because they aren't your clients, limitations run. So as long as DPS just doesn't turn it over, even if she alleges a conspiracy to conceal, she can't explore that? At the point in time when she sued our defendants, the limitations issue was already over. The, if she had done that in the first lawsuit, perhaps. But she, and maybe she, maybe the court questions whether or not that first lawsuit turned out the right way. But it turned out the way it turned out, and it was affirmed on appeal. She chose to sue the county, even though she was alleging acts of its agents. Didn't sue John Doe's, got dismissed, and that was affirmed in this court, where the court found she didn't use diligence, and the district court, on a Rule 60 motion, wouldn't let her sue the individuals, because limitations had run by that point. And even if you assume a different scenario for how to calculate limitations, it certainly ran within two years of the time. That was the court on, on panel re-hearing, made the statement that she didn't show due diligence, correct? The panel re-hearing, that's when it comes in, right? The 60B denial, they forgot to put it in the original panel decision. Then the panel did a re-hearing, and they put in that paragraph you're referring to, correct? I believe that's correct. Yeah, okay. And their first reason, saying she didn't have due diligence, was, oh, it was easy to discover the medical records, is that correct? This court said she had unfettered access to the medical records. Yeah, but. She was the estate representative. Right, how, but you heard him describe the medical records. How does that identify who did what? It says he has a head laceration, and he got pepper sprayed. How do they know who did what? That, he had the duty to investigate that. Well, I agree with that. He did have the duty to investigate that. Once she had the most basic information. But her duty to investigate, she's told by the district court, go get the public records, and then no one gives her the public records until the day after. But none of that happened until after she had filed the lawsuit. Limitations had already. So what's your best case for the fact that this, as a matter of pleadings, we can assume she had such woeful diligence that, as a matter of law, she's out of time. What's your best authority? Because I read Piotrowski and Green to be adverse to you. Give me one that's good. I think Green helps us because. I know, I'm asking you to give it to me other than Green. King White is our best case, along with Jensen versus Snelling. And it talks about the level of diligence a plaintiff is put on duty to exercise once they have even the most basic information of a potential wrong. And I admit, I don't remember those cases. Did they involve the government concealing information until the day after the statute runs? Either of them? Neither of them involve a prior lawsuit alleging the same thing they're trying to allege another two years later. And that's the distinction between any plaintiff's arguments in trying to. Sexual limitations cases can be characterized in so many different ways, and quotes can be pulled out of them in so many different ways. But none of them are where, all these arguments about what she knew from the time of his death, she knew of his death, she knew it was a sudden, unexpected death in custody when he was 38 years old and otherwise healthy. She knew the Texas Rangers were investigating the case she cites more than any other, Thorpe V Weaver, the district court said, once she learned from the, got, the father was an intervener plaintiff in Thorpe V Weaver, got a call from the ranger that he was investigating, that was enough to put her on notice. She had a death certificate where she- What, what should she have done? I mean, if she had filed public records requests in August of 2019 and the agency's just stonewalled then, I mean, would that excuse it? Well, one, we don't know what would have happened if she had- Well, we know what did happen, which is they stonewalled her. Or whatever they did, they took forever and a day to produce things. She didn't ask, she or her lawyers didn't ask for anything, and certainly not from the county, certainly not from our clients, but even from the county- I don't understand why you don't just concede that point. Concede what, I'm sorry? Just, had she filed a timely public records request, that would have arguably told. Because you're about to lose me. I'm just not hearing the question. If she had- I don't understand why you're not conceding that had she filed a timely public records request, that would have been due diligence. I took your main argument to be that she didn't file her first public records request until after the two years. That's your argument. Correct. And I think Judge Wilson just asked if she had filed that in a more timely fashion, would the result be different? And your answer- I thought he was making the point that she wouldn't have gotten the records. I think that, I thought that's, he was- No, I'm asking the question of what was she supposed to do? She can't just haul off and file a lawsuit in August of 2019 with no basis. So how is she supposed to find out, and the only example of public records request that she made took months and months for the state to turn around and produce. If she had filed an open records request any time earlier, then the argument would be different at this point, and at that point she, the records request may have been fulfilled as it was for the New York Times, or she could have- Can I dovetail with your argument that she could have filed John Doe's 1 through 10, she could have named defendants, she could have done some other things. I mean, I guess when she filed her suit timely, the first suit, help me here, we're talking a lot about discovery and the district court's tamping down on  Could she have, what discoveries could she have done once she filed that initial action? Talking about July 2021. At that point, she could have filed a motion asking for discovery for the identities of the John Doe defendants that she named John Doe's. Could she have subpoenaed the agencies? Sure, potentially. If she had named John Doe's under Green versus Doe and diligently pursued discovery of the identities, then this would be in a different posture, but by her decision not to sue the John Doe's, it takes it out of that realm. If I could point out a couple of quick facts. Well, what if the prison incident report said, ma'am, we're sorry your husband, very young, died. Another prison inmate killed. And then the day before limitations runs or the day after, actually make it parallel to this case, DPS day after. So now she's out of luck on time. Actually, we've got 200 pages that show it was the the prison guards that did tough luck. She should have just she should have just not pursued it more. Well, in other words, what I'm worried about is exactly what I asked, how is not a blueprint for Tarrant County, which has had a huge number of  How is it not a blueprint for them to always avoid 1983? They just don't turn over the discovery that ties up the knots, proves causation, until the day after. What's the limiting principle to your argument? Well, with all due respect, in this case, if we allow this case to be reversed under these facts, under this procedural history, it's a blueprint for how plaintiffs can avoid statutes of limitations. Sue one defendant, wait and see what happens. Find somebody else, sue a different defendant, and say, well, I didn't have to sue them the first time. It's- She may lose. It may prove that they didn't conceal it deliberately to let the tolling period run, right? There may be reasons why, in spite of repeated requests and the court saying, get it from the public requests, you're not getting discovery. There may, it may have been legitimate. They may not have timed it just to do it. We just don't know that, right? You said you don't know why they waited until the day after. The DPS released its report. Where does the court get it that's the day after limitations? It's the day after the suit was dismissed. The day after the suit was dismissed. It's not the date. February 12, 2022, the district court dismissed on February 11, 2022. If I were to surmise, the district court, the DPS may have taken the position that it was a subject to ongoing litigation as their position for withholding the records under the Open Records Act, under the Public Information Act in Texas. There's litigation exception. If they were taking that position and the case was dismissed, then that exception wouldn't apply and they released it as fast as they could have. Wasn't there a finding somewhere? Am I imagining the district court finding there was no intentional withholding of the documents, making that up? I think plaintiffs initially asserted a fraudulent concealment claim, but they've abandoned that. They haven't raised that on appeal. They haven't kept that on appeal. They're not alleging that any of our defendants fraudulently concealed anything at this point, is my understanding. What's your best case that as a third party, she even could get the medical records? What's your best case for that authority? There is the, give me one second, Your Honor. A case that plaintiff cites is, it's, I don't know if that's my best case, Your Honor. It's a case she cites, Lewis versus TDCJ, where the plaintiff there submitted an open records request with medical authorizations to the agency. And she got the medical records, but she didn't have psychiatric records included in there, and that was the dispute in that case. But here, some of the discussions about what she could have gotten from the jail. He was taken to John Peter Smith Hospital. She could have sent a medical records authorization to the hospital and gotten those very same records. If I may very quickly run through a couple of facts. She had the death certificate which said, which had no cause of death listed on the death certificate. She knew he died. She knew there was a ranger investigation. She had access to the medical records. We know that from the prior case, because she filed those medical records in the prior case. And the custodial death report was on file, which is a constructive notice to the world about what happened. That custodial death report was filed on 9-25-2019. And it said that there was a struggle, pepper spray, an altercation, he was found unresponsive in his cell. That's, and for clarification's sake, in our brief at footnote 13, we cite a link to the custodial death report. That is a bad link because it's a law enforcement link that goes to a, you got a login page, but if you or she Google custodial death report Texas, then it pulls up the link and you type in Robert Miller and it pulls up his custodial death report, which was available in September 2019. Which shows the pepper spray, affirmative. Pepper spray altercation, found unresponsive. The New York Times article, by the way, if their claim is on November 30th, 2021, when that article was published according to their allegation, that's when accrual should be. That article was published a month before and they said that in their prior lawsuit. And that's prior lawsuit ECF number 29 at page 3, footnote 7, cites that article and has the date of publication. I don't know why in this brief, in this court, they're saying it was published on that date. It was not in their earlier claims. I think they were trying to say, they don't, they're not clear, but I think they may have been saying they didn't read it until that date, but it was not published on that date. And the Willette case out of the First Circuit, that plaintiff's site, and it's O-U-E-L-L-E-T-T-E, says that she's charged, the plaintiff is charged with two things. The available information at the time and anything she would have discovered had she been on notice to investigate further, and it's a very low threshold of the notice to investigate further. My time's up, your honors. Thank you for your time. Thank you. Counsel? May it please the court. Are you familiar with this case as King, White, and Jensen? Yes, I am familiar with White. Do you want to distinguish that? Absolutely. I don't think that White cuts against the argument that we've been making here, because essentially what White did was clarify what the statute of limitations is for a 1983 case. And it said, look, you can't bring a 1983 case claiming that you could have put it under a different rubric and then basically a rose by any other name still smells as sweet. You're calling your 1983 case a Title IX case, but it's still a 1983 case. So the two-year statute of limitations applies, not the five-year statute of limitations. That's not what happened here. Is it an equitable tolling case? No. I don't see it as an equitable tolling case, no. What about Green, though? I know in analysis it may favor you, but his point is 11 months before the statute of limitations ran, Mr. Green did commence the suit. He did. I would love to say Green helps us, but I don't think Green is analogous to what happened here, because when we have this discussion about a John Doe, it's not as simple as saying, John Doe hurt me. That's not going to let you survive a 12b6. You have to be able to allege with enough credit, with enough particularity, to state a cause of action that is plausible on its face. So if we were able to say what we could after we received that report, that 250-page report, John Doe pinned him to the ground, slammed him to the ground after he was handcuffed behind his back, while he's handcuffed behind his back, John Doe takes pepper spray, sprays it directly in his face, does that another time, and witnesses a third officer do it yet again, and then we talk about what else John Doe did, then we could make the argument that all we need to do is substitute the officer's real name for the John Doe. That's not what happened here, because we didn't have those details until they actually released the report. Was the custodial death report available in 2019, in September 2019? As far as I know, the custodial death report was available. I would note something for the court. If you look at that custodial death report right now, it has been amended, and it's not clear what was amended, nor is it clear what was available in 2019 when it would have been posted. The autopsy that relates to this case was also amended, and I suspect they were probably amended around the same time. I have no way of verifying that until we conduct discovery, but the amended autopsy provides additional details about the struggle that occurred with law enforcement. With the amended autopsy report, we could have pled our claims with more particularity than before that autopsy report was amended. And again, I had my wife, who is a physician scientist, review both of those reports to make sure I'm not seeing things that I want to argue, but there are, in fact, additional medical details that enable additional conclusions. So whatever was put up there needs to control based on what would have been available back in 2019. If it's consistent with the autopsy report, all she would know is that he died of natural causes. It would have listed sickle cell anemia. It may or may not have said that he had a struggle with an officer or that pepper spray was involved, but that doesn't mean any individual officer used excessive force, denied medical treatment, or did anything that we could otherwise bring a 1983 claim for. But the reason we don't know is because she didn't request it in 2019. I would say the reason we don't know is because we don't know how it was amended, but even if we go by... If she'd requested it or if she'd obtained it in 2019 in September when it was available, we would know what it said. Absolutely, Your Honour. But based on what's available now, which looks like it's more than what was there previously, we couldn't have filed individual claims against any officer. We still... We cannot do it without that report. But as you say here today, you don't know that because you don't know what the original form was because she never asked for it. But that suggests that they removed details, which I don't see why they would do, nor ethically, I don't understand how they could remove details from what's currently being reported. I think that if you look at the record, they only would have added details to what's been reported. I do also want to... The first records request was after two years, right? Yes, sir. That's correct. Why is that itself not evidence of lack of diligence? Because I think that lack of diligence... I mean, after two years, there's nothing to toll. Absolutely. When you look at the discussions of lack of diligence in the case law, it also functions by discussing what a person would have likely been able to obtain. And so I think it's relevant what happens once the questions began being asked. I also don't think... Isn't it relevant when you ask the questions? Beg your pardon, sir? Isn't it also relevant when you ask the questions? It does matter when you ask the questions, absolutely. You didn't ask questions... Your client didn't ask questions until two years later. She didn't make public records requests until two years later. She asked the questions that she could based on what she knew. But you're also hitting at an important point in the cases that we've cited that involve authorities having contact with plaintiffs before they file causes of action. They're remarkably generous in their meetings with plaintiffs. In more than one case, authorities sat down and talked to someone about the findings of an autopsy before they found the report. I'm sorry, I'm out of time, Your Honor. I don't want to test your patience. The other cases were individuals had contact with law enforcement before they filed their claims. Law enforcement did not withhold information from those individuals. And the analysis turns on that. Counsel? Thank you, sir. Thank you, Your Honor. The case is submitted. We'll take a brief recess before our final case of the day.